RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0141P (6th Cir.)
File Name: 04a0141p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

HARRY TRUMAN AILOR and
BETTY DARLENE LYNCH,
    *Plaintiffs-Appellants,*

    *v.*

CITY OF MAYNARDVILLE,
TENNESSEE,
    *Defendant-Appellee.*

No. 01-6562

———————————

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 01-00241—James H. Jarvis, District Judge.

Argued: September 16, 2003

Decided and Filed: May 17, 2004

Before: SUHRHEINRICH, COLE and ROGERS, Circuit
Judges.

———————————

## COUNSEL

**ARGUED:** Kelly O. Herston, HERSTON LAW OFFICE,
Knoxville, Tennessee, for Appellant. Jon G. Roach,
WATSON & HOLLOW, Knoxville, Tennessee, for Appellee.
**ON BRIEF:** Kelly O. Herston, HERSTON LAW OFFICE,

2    *Ailor, et al. v. City of Maynardville, TN*   No. 01-6562

Knoxville, Tennessee, Robert R. Kurtz, ELDRIDGE, IRVINE
& GAINES, Knoxville, Tennessee, for Appellant. Jon G.
Roach, Nathan D. Rowell, WATSON & HOLLOW,
Knoxville, Tennessee, for Appellee.

SUHRHEINRICH, J. delivered the opinion of the court, in
which ROGERS, J. joined. COLE, J. (pp. 24-26), delivered
a separate opinion concurring in part and dissenting in part.

———————————

## OPINION

———————————

SUHRHEINRICH, J. Plaintiffs-Appellants Betty Lynch
("Lynch") and Harry Ailor ("Ailor") (collectively
"Plaintiffs") appeal from the order of the district court
granting summary judgment in favor of Defendant-Appellee
City of Maynardville, Tennessee ("City"), in this action
brought pursuant to the Clean Water Act[1] ("CWA"), and the
Resource Conservation and Recovery Act[2] ("RCRA"). For
the reasons that follow, we **AFFIRM** the judgment of the
lower court.

### I. Background

#### A. Clean Water Act

The Federal Water Pollution Control Act, or Clean Water
Act, 33 U.S.C. §§ 1251-1387 (2001), mandates that toxic
discharges into the nation's waterways be monitored and
regulated. To accomplish this, the CWA authorizes the
Administrator of the Environmental Protection Agency
("EPA") or authorized state agencies, to issue National

———————————

[1] 33 U.S.C. §§ 1251-1387 (2001).

[2] 42 U.S.C. §§ 6901 *et. seq.*

Pollution Discharge Elimination System ("NPDES") permits. 33 U.S.C. § 1342. Permit holders are subject to state and federal enforcement actions, as well as suits by private citizens. *See* 33 U.S.C. §§ 1319 ("State enforcement, compliance orders") and 1365 ("Citizen suits").

The CWA's citizen's suit provision permits any individual who has an interest which is or may be adversely affected to sue to enforce any limitation established by a NPDES permit. § 1365(a) and (g). The CWA limits the remedies available to citizen plaintiffs to injunctive relief, the assessment of civil penalties, and attorney's fees. *See* 33 U.S.C. § 1365(a), (d); *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 175 (2000). No compensatory damages are authorized under the CWA. *See Middlesex County Sewage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 18 (1981). Furthermore, civil penalties are payable to the United States Treasury. *Laidlaw*, 528 U.S. at 175. The CWA also "does not permit citizen suits for wholly past violations." *Gwaltney of Smithfield v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 64 (1987); *see also Steel Co. v. Citizens for a Better Env't.*, 523 U.S. 83, 106-07 (1998) (holding that citizen plaintiffs lack standing to seek civil penalties for wholly past violations).

Citizen suits are merely intended to supplement, not supplant, enforcement by state and federal government agencies. *Gwaltney*, 484 U.S. at 60. Such agency suits trump the CWA's citizen suit provision, provided that: (1) they are initiated prior to the commencement of a citizen's suit, § 1319(g)(A)(i); (2) are diligently prosecuted, *id.*; and (3) are brought in a court of the United States or any State court. § 1365(b)(1)(B). *See generally Jones v. City of Lakeland*, 224 F.3d 518 (6th Cir. 2000) (en banc). Likewise, where a "State has commenced and is diligently prosecuting an action under a State law comparable to" the CWA, citizen suits are precluded. § 1319(g)(6)(A)(ii). However, in *Lakeland,* this Court held that an action under the Tennessee Water Quality Control Act is not comparable to 33 U.S.C. § 1365(a)(1)(B)

and/or 33 U.S.C. § 1319(g)(6). *Lakeland*, 224 F.3d at 524. *Lakeland* also held that a proceeding before the Tennessee Department of Environment and Conservation ("TDEC") is not "court enforcement" for purposes of §§ 1319(a) and 1365(b). *Id.* at 521-22.

### B. Facts

The City owns and operates a sewage treatment plant along Bull Run Creek. In the past, the treatment plant has overflowed, discharging raw sewage and other pollutants into the creek. Plaintiff Lynch owns approximately 100 acres of land in Union County, along Bull Run Creek, downstream from the plant. Plaintiff Ailor owned approximately 36 acres of land along Bull Run Creek, downstream from the plant until approximately October of 2000. Both parties have obtained drinking water from private wells located on their property.

### 1. The City

The City operates its sewage treatment plant under an NPDES permit. Because of repeated violations of its NPDES permit in the early 1990s, the Tennessee Department of Environment and Conservation ("TDEC") commenced enforcement proceedings against the City in 1993. On November 16, 1993, J.W. Luna, the Commissioner of the TDEC, issued an Order and Assessment against the City, in which he found that "[f]rom January 1991, thru December 1992, the [City's] self monitoring information revealed the following NPDES permit violations":

Biochemical Oxygen Demand . . . . 99 violations
Total Suspended Solids . . . . . . . . . . 4 violations
Ammonia . . . . . . . . . . . . . . . . . . . . 27 violations
Fecal Coliform . . . . . . . . . . . . . . . . . 9 violations
Chlorine . . . . . . . . . . . . . . . . . . . . . . 9 violations

The Commissioner also found that the City failed to submit an Industrial User Survey to the Tennessee Division of Water Pollution Control within one hundred twenty (120) days after the NPDES permit was issued.

The Commissioner found that "[b]y discharging wastewater effluent from the plant in violation of the terms and conditions of the NPDES permit," the City had violated TENN. CODE ANN. § 69-3-108(b)(3) and (6), which makes it unlawful to discharge any wastes in excess of the amount allowed by the permit. The Order further found that, by failing to submit an Industrial User Survey, the City had violated TENN. CODE ANN. § 69-3-114(b) (2003). The Order and Assessment therefore required the City to do the following:

1. The Respondent [the City] shall initiate a continuous collection system rehabilitation program within sixty (60) days of entry of this Order.

2. The Respondent shall submit a complete Industrial User Survey to the Tennessee Division of Water Pollution Control within ninety (90) days of entry of this Order.

3. The Respondent shall bring the plant into compliance with the Act and NPDES permit #TN0022870 within ninety (90) days of entry of this Order.

4. The Respondent shall pay a Civil Penalty to the Department, hereby assessed in the amount of TWENTY FIVE THOUSAND DOLLARS ($25,000.00), to be paid [in various increments].

The Order and Assessment indicated that, pursuant to TENN. CODE ANN. § 69-3-109 (a)(3), an Order for Corrective

Action "shall become final and not subject to review" unless a timely written petition for a hearing were filed with the Tennessee Water Quality Control Board.

Thereafter, through hearings and meetings between the Board and the City, an Agreed Order ("Order") was entered on July 18, 1995, assessing a civil penalty against the City and requiring it to develop and implement a corrective action plan to bring its plant into compliance with the NPDES permit.[3] The Board adopted the facts and conclusions of law set forth in the Commissioner's Order and Assessment.

The Order required the City to do the following:

1. [S]ubmit to the Division (Knoxville Field Office) for approval, on or before the 1st day of May, 1996, a corrective action plan that addresses at a minimum the following:
   (a) A review of "Mini-Systems";
   (b) Smoke Testing for a representative portion of the collection systems;
   (c) Dry weather flow measurements;
   (d) A physical survey of the systems; and
   (e) Wet weather flow monitoring;

2. [S]ubmit to the Division (Knoxville Field Office) for approval, within sixty (60) days of approval of the corrective action plan, an engineering report that evaluates the current hydraulic and organic loading at the wastewater treatment plant and recommends alternatives for additional treatment capacity including a time schedule for completion of treatment plant expansion.

---

[3]The Agreed Order stated that the "cause came to be heard before a quorum of the Water Quality Control Board upon the Commissioner's Order and Assessment dated November 16, 1993, directed to the Respondent, Town of Maynardville, the Respondent's appeal and the joint motion of the parties," and that "the Board approved their settlement of this matter as embodied herein."

3.  [W]ithin one hundred eighty (180) days of approval of the engineering report, submit to the Division (Knoxville Field Office) for approval plans and specifications for the expansion of the wastewater treatment plant and correction of inflow and infiltration.

4.  [I]mplement and complete all remedial activities set forth in the above approved plans and specifications in accordance with those time schedules (included and as approved by the Division) but in no event any later than thirty-six (36) months from the approval of such plans and specifications.

The order further assessed a civil penalty against the City in the amount of $18,750, of which $16,875 was to be paid only if the City failed to comply with the Order.  The City paid $1,875 to the TDEC on July 18, 1995.

The Order also stated that the Division reserved the right to request modifications to the "corrective action report, engineering report, plans and specifications and/or any time schedules encompassed therein as deemed necessary by the Director to achieve compliance with the Act."

The City completed all of the required actions under the Order and placed the new wastewater treatment plant on line in November, 2000, and received the final inspection report on February 26, 20015.  The City spent approximately 1.7 million dollars in upgrading the plant.

### 2. Plaintiffs

On January 30, 1998, Lynch and Ailor filed suit against the City in state court, seeking compensatory damages under several theories of state law.  On February 7, 2001, two and one-half months after the City's wastewater treatment plant was in full operation, Plaintiffs gave the City notice of a pending lawsuit, as required under the CWA and RCRA.  *See* 33 U.S.C. § 1365(b); 42 U.S.C. § 6972(b).  On May 16, 2001,

Lynch and Ailor again filed suit against the City, this time in federal court, under the CWA, the RCRA, and state law.  The complaint alleged that the City's sewage treatment plant "frequently overflows, thereby discharging untreated sewage and other pollutants into Bull Run Creek," and that "[t]his frequent discharge of raw sewage, and other pollutants, past and present, has caused Plaintiffs serious bodily injury and loss of value in Plaintiffs' property."  Plaintiffs sought remedial relief, compensatory damages, punitive damages, and litigation costs, including reasonable attorney's fees.[4]

### 3. District Court Proceedings

On September 10, 2001, the City moved for summary judgment.  The City argued that summary judgment was appropriate because the City was the subject of an enforcement action commenced by the State which was being diligently prosecuted under 33 U.S.C. § 1319(g)(6)(A)(ii).  Furthermore, the City asserted that it had complied with the terms of the corrective action.  In support, the City attached several affidavits.  The City Recorder, Hazel Gillenwater, attested that, as of September 6, 2001, the City was operating within the NPDES permit.  John West, an environmental

---

[4] Specifically, in their prayer for relief, Plaintiffs requested the following:

WHEREFORE, Plaintiffs sue Defendants for an Order compelling Defendants to provide remedial relief for all harm done to Plaintiffs' property as a result of the acts alleged herein, compensatory damages in an amount not to exceed $750,000, punitive damages in an amount not to exceed $500,000, the costs of this litigation pursuant to 33 U.S.C. § 1365(d) and 42 U.S.C. § 6972(e), including reasonable attorney's fees and all further and general relief to which Plaintiffs are entitled.  Plaintiffs demand a trial by jury.

specialist for TDEC, stated in his affidavit that he had the responsibility for monitoring, compliance, and enforcement of the City's wastewater treatment facilities and NPDES permit. West stated that "[t]he City substantially complied with all aspects of the Order such that no further penalty payments were necessary. Finally, he stated that as of September 7, 2001, "[r]ecent inspections revealed that the City is operating its Wastewater Treatment Plan and Collection System in substantial compliance with the laws relative to its operation of the Wastewater Treatment Plant and is meeting the effluent standards specified by the NPDES permit." In his affidavit, Arthur S. Baker, a professional engineer employed by Lamar Dunn & Associates, Inc., the City's consulting engineers, stated that as of September 6, 2001, the City had "completed the necessary improvements to its Wastewater Treatment Plant and the replacement and rehabilitation of Phase I and Phase II of its Wastewater Collection System."

The City also asserted that Plaintiffs' complaint should be dismissed because they sought recovery of compensatory or punitive damages, which are not available under the CWA.

In their response to the City's motion for summary judgment, Plaintiffs did not provide any evidence to controvert the City's assertion that it had completed its obligations under the Order. Rather, Plaintiffs alleged in relevant part as follows:

The plaintiffs claim that they have suffered property damages and personal injuries as a result of the defendant's actions. Compl. ¶ 11. In addition, if the plaintiffs prevail in this action, they are entitled to recover their reasonable attorneys' fees and litigation costs, including environmental testing and expert witness fees, all of which are typically substantial in environmental cases. 33 U.S.C. § 1365(d).

Plaintiffs also did not assert, let alone offer proof, that the City was in violation of the NPDES permit as of May 2001 or September 2001.

In its reply to Plaintiffs' response to the motion for summary judgment, filed on October 3, 2001, the City asserted that from the time of the enforcement action taken by the TDEC, the City had "moved expeditiously to remedy the deficiencies in its plant." The City reiterated that its

new waste water treatment plant was completed and waste water treatment plant operations began on November 20, 2000. Phase I of the City's Waste Water Collection Rehabilitation was completed on January 25, 2001 and the City's Phase 2 Waste Water Collection System Rehabilitation was completed on May 31, 2001. . . . The new plant has been operating for more than ten (10) months with no discharges in violation of its NPDES permit.

The reply brief also stated that

[t]hroughout the process of the state of Tennessee's Enforcement Action, it has been abundantly clear that the problem which the City faced in its operation of its wastewater treatment was due primarily to an old plant which was no longer able to satisfactorily treat the wastewater being generated by a growing population. Once the City's new wastewater treatment plant commenced operation, its discharges have met its NPDES permit."

The City therefore asserted that, as demonstrated by the affidavit of the TDEC representative, the case was moot based upon events subsequent to November 20, 2000.

Significantly, the City also stated that its discharge from its wastewater treatment plant had substantially met its NPDES permit with no violations for the past four months, and only

minor violations occurring in February (chlorine limit), March (chlorine limit and ammonia/nitrogen), and May (ammonia/nitrogen).

The district court granted summary judgment to the City on November 5, 2001. The district court noted that the TDEC enforcement action did not preclude Lynch's and Ailor's citizen suit under the CWA in light of *Jones v. City of Lakeland*, 224 F.3d 518 (6th Cir. 2000) (en banc). Nevertheless, the district court granted the motion, stating that the relief available to Lynch and Ailor under both the CWA and RCRA had already been granted. The court concluded that, "under the unique facts of this case, a claim under the CWA is moot at this time and was moot at the time it was filed."

[T]he State of Tennessee initiated an enforcement action against the City of Maynardville in 1993. As a result of that state action, the City was fined and forced to come up with a plan for remedying its effluent problem. The City of Maynardville did what was requested by the State of Tennessee and ultimately, at an expense of more than $1 million, expanded its treatment plant which went on-line in November 2000. It is undisputed that the expansion of the treatment plant has remedied the overflow problem, *since there is no evidence that any overflow has occurred since November of 2000.* Plaintiffs then filed this lawsuit in this court in May 2001. *At the time plaintiffs filed the lawsuit here under the CWA, the State had already obtained, through its administrative procedures, any remedy which plaintiffs might have obtained with a citizens suit under the CWA.*

(Emphasis Added.)

The court further observed that the RCRA would not "give the plaintiffs any right or remedy not available under the CWA." The district court declined to exercise jurisdiction over supplemental state law claims which were "appended

only to a moot federal claim." Lastly, the court noted that because Plaintiffs' complaint under the CWA was already moot by the time the federal complaint was filed, "[i]t would be illogical to allow the plaintiffs to recover attorney's fees for a claim filed under the CWA."

On November 12, 2001, Plaintiffs filed a motion to alter or amend judgment. Plaintiffs' motion was based principally on the City's admission in its reply brief that it violated its NPDES permit several times after the upgraded treatment plant went on-line in November of 2000. In support, Plaintiffs attached a letter from TDEC, Division of Water Pollution Control, stating that, based on the City's Discharge Monitoring Reports ("DMRs"), the City had violated the NPDES permit in February, March and May of 2001. Also attached were two letters from Michael Payne, Chief wastewater plant operator, to John West, stating that the City incurred an overflowing manhole on February 25, 2001, and April 3, 2001. West also indicated that, in both instances the overflow subsided the same day.

In its response, the City stated that the manhole overflows were unrelated to the operations of the wastewater treatment plant itself. Further, the City stated that the incidents occurred prior to the completion of Phase II of the City's collection system rehabilitation project. Finally, the City reasserted that because it had corrected the deficiencies in its collection and treatment systems, Plaintiffs' CWA suit was moot.

The district court summarily denied the motion, "[g]ood cause not being shown."

Plaintiffs filed this timely appeal, claiming that the City did not carry its "heavy burden" required to establish mootness, and that their RCRA claim was improperly dismissed.

## II. Analysis

We review the district court's grant of summary judgment de novo. *Banks v. Wolfe County Bd. of Educ.*, 330 F.3d 888, 892 (6th Cir. 2003) (citations omitted). Summary judgment is proper when there is no dispute as to a material issue of fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

## A. CWA Claim

Plaintiffs argue that the district court erred in granting the City's motion for summary judgment on the grounds that Plaintiffs' CWA claims were moot. Plaintiffs submit that the City did not carry its "heavy burden" of persuading the court that further violations of the NPDES are not likely to recur, as required by *Laidlaw*. *Laidlaw* holds that a defendant's voluntary cessation of a challenged practice does not ordinarily moot a case. *Laidlaw*, 528 U.S. at 189 (citation omitted). In other words, voluntary cessation of the challenged conduct does not ordinarily moot a case unless "subsequent events ma[ke] it absolutely clear that the allegedly wrongful behavior could not be reasonably expected to recur." *Id.* (internal quotation marks omitted). The "heavy burden" of establishing that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness. *Id.*

As noted above, the district court held that Plaintiffs' CWA claim was "moot [at the time of summary judgment] and moot at the time it was filed." Although the district court characterized it as mootness, the latter half of the district court's statement implicates standing. *See id.* at 191 (discussing distinctions between standing and mootness). We therefore begin our analysis with standing.

## 1. Standing

"[S]tanding concerns only whether a plaintiff has a viable claim that a defendant's unlawful conduct 'was occurring at the time the complaint was filed.'" *Cleveland Branch, NAACP v. City of Parma, Ohio*, 263 F.3d 513, 525 (6th Cir. 2001), *cert. denied*, 535 U.S. 971 (2002) (quoting *Laidlaw*, 528 U.S. at 184). "The Supreme Court has consistently held that jurisdiction is tested by the facts as they existed when the action [was] brought and that after vesting, it cannot be ousted by subsequent events." *Id.* at 524. To establish initial standing to bring suit, a plaintiff must demonstrate (1) he or she has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, as opposed to conjectural or hypothetical; (2) the injury is fairly traceable to the defendant's challenged action; and (3) it is likely, not speculative, that the injury will be redressed by a favorable decision. *Id.* at 523-24 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

Mootness addresses whether the plaintiff continues to have an interest in the outcome of the litigation. *City of Parma*, 263 F.3d at 525. "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 (1969). In other words, "[i]f events that occur subsequent to the filing of a lawsuit or an appeal deprive the court of the ability to give meaningful relief, then the case is moot and must be dismissed." *Al Najjar v. Ashcroft*, 273 F.3d 1330, 1336 (11th Cir. 2001).

As the district court implicitly recognized, this case raises both standing and mootness concerns. *See generally Laidlaw*, 528 U.S. at 180-92 (discussing distinctions between the two doctrines). By the time Plaintiffs gave notice of intent to sue in February 2001 and filed suit sixty days later on May 16, 2001, the State of Tennessee had already procured the relief Plaintiffs sought in their complaint, namely remedial efforts to stop violations of the NPDES permit. In fact, by the time

of Plaintiffs' suit, the State of Tennessee had already been at the task for approximately seven years, beginning with the Commissioner's Order and Assessment on November 16, 1993. By the time of Plaintiffs' federal action, per orders of the State of Tennessee, the City had installed and made operational a new wastewater treatment plant, at a cost of over $1 million, to bring it into compliance with its NPDES permit. Thus, by the time Plaintiffs' suit was initiated, Plaintiffs essentially no longer had an "injury in fact" that was "actual or imminent." But for the fortuity of four minor discharges in February, March, and May of 2001, Lynch clearly lacked standing,[5] because the relief requested in the complaint was by that time for wholly past violations.

The district court's sense that Plaintiffs' standing was problematic is bolstered by comparison with the Supreme Court's decision in *Gwaltney*. In that case, the Virginia State Water Control Board issued a NPDES permit to the petitioner Gwaltney of Smithfield, Ltd., in 1974 authorizing Gwaltney to discharge seven pollutants, including fecal coliform, chlorine, and total Kjeldahl nitrogen (TKN), from the company's meat-packing plant on the Pagan River in Smithfield, Virginia. *Id*. at 53. Between 1981 and 1984, the company repeatedly violated the conditions of the permit by exceeding effluent limitations on five of the seven covered pollutants. *Id*. In March 1982, the company installed new equipment to improve its chlorination system, and the last reported chlorine violation occurred in October 1982. *Id*. The new chlorination system also helped control the discharge of fecal coliform, the last of which occurred in February 1984. *Id*. at 54. In October 1983, the company

---

[5]Ailor, in any event, clearly lacked standing. The complaint reflects that he did not own the property at the time the federal complaint was filed. He no longer had an "injury in fact" that is fairly redressable by a favorable decision since the CWA "does not permit citizen suits for wholly past violations." *Gwaltney*, 484 U.S. at 64.

upgraded its wastewater treatment system, and the last reported TKN violation occurred on May 15, 1984. *Id*.

The respondents, two environmental groups, sent notice in February 1984 to the company, the EPA, and the Virginia Board of their intent to file a citizen suit under the CWA based on the company's violations of its permit conditions. *Id*. The respondents filed suit in June 1984. *Id*. The company moved to dismiss for lack of subject matter jurisdiction under the Act, arguing that the language of § 505(a) [33 U.S.C. § 1365(a)], which allows private citizens to bring suit against any person "alleged to be in violation" of the Act, required the defendant to be violating the Act as of the time of suit. *Id*. at 54-55. The company contended that, because its last recorded violation occurred several weeks before the respondents filed their complaint, the district court lacked jurisdiction over the action. *Id*. at 55.

The Supreme Court agreed, holding that "[t]he most natural reading of 'to be in violation' is a requirement that citizen-plaintiffs allege a state of either continuous or intermittent violation–that is, a reasonable likelihood that a past polluter will continue to pollute in the future." *Id*. at 57. The Court observed that "the pervasive use of the present tense throughout § 505," especially in the definition of "citizen" as "'a person . . . having an interest which is or may be adversely affected' by the defendant's violations of the Act," *id*. at 59 (quoting § 1365(g)), made plain that "the harm sought to be addressed by the citizen suit lies in the present or future, not in the past." *Id*. The Court reasoned in relevant part:

> Any other conclusion would render incomprehensible § 505's notice provision, which requires citizens to give 60 days' notice of their intent to sue to the alleged violator as well as to the Administrator and the State. § 1365(b)(1)(A). If the Administrator or the State commences enforcement action within that 60-day period, the citizen suit is barred, presumably because governmental action has rendered it unnecessary.

§ 1365(b)(1)(B). It follows logically that the purpose of notice to the alleged violator is to give it an opportunity to bring itself into complete compliance with the Act and thus likewise render unnecessary a citizen suit. If we assume, as respondents urge, that citizen suits may target wholly past violations, the requirement of notice to the alleged violator becomes gratuitous.

*Id.* at 59-60. The Court further observed that

Adopting respondents' interpretation of § 505's jurisdictional grant would create a second and even more disturbing anomaly. The bar on citizen suits when government enforcement action is under way suggests that the citizen suit is meant to supplement rather than to supplant governmental action. The legislative history of the Act reinforces this view of the role of the citizen suit. The Senate Report noted that "[t]he Committee intends the great volume of enforcement actions [to] be brought by the State," and that citizen suits are proper only "if the Federal, State, and local agencies fail to exercise their enforcement responsibility." S.Rep. No. 92-414, p. 64 (1971), reprinted in 2 A Legislative History of the Water Pollution Control Act Amendments of 1972, p. 1482 (1973) (hereinafter Leg. Hist.). Permitting citizen suits for wholly past violations of the Act could undermine the supplementary role envisioned for the citizen suit. This danger is best illustrated by an example. Suppose that the Administrator identified a violator of the Act and issued a compliance order under § 309(a). Suppose further that the Administrator agreed not to assess or otherwise seek civil penalties on the condition that the violator take some extreme corrective action, such as to install particularly effective but expensive machinery, that it otherwise would not be obliged to take. If citizens could file suit, months or years later, in order to seek the civil penalties that the Administrator chose to forgo, then the Administrator's discretion to enforce the Act in the public interest would be curtailed considerably. The

same might be said of the discretion of state enforcement authorities. Respondents' interpretation of the scope of the citizen suit would change the nature of the citizens' role from interstitial to potentially intrusive. We cannot agree that Congress intended such a result.

*Id.* at 60-61.

Notwithstanding its conclusion that § 505 does not permit citizen suits for wholly past violations, the Supreme Court remanded for further proceedings, because the respondents had also alleged in their complaint that the company was continuing to violate its NPDES permit when they filed suit. *Id.* at 64. The Supreme Court concluded that § 505 confers jurisdiction over citizen suits when the citizen-plaintiffs make a good-faith allegation of continuous or intermittent violation. *Id.* The Court rejected the company's argument that this construction of § 505 would permit citizen-plaintiffs to pursue their suits to conclusion even if their allegations of ongoing noncompliance became false at some later point in the litigation because the defendant begins to comply with the Act, reasoning that "[l]ongstanding principles of mootness" would prevent maintenance of suit when there was no reasonable expectation of recurrence. *Id.* at 66-67.

Like the citizen-plaintiffs in *Gwaltney*, Plaintiffs did not file their federal complaint until several weeks after the last recorded violation, and after the defendant polluter had installed new treatment systems to bring itself into compliance with its NPDES permit. Like *Gwaltney*, the remedial efforts were not prompted by the citizen-suit; indeed the remedial actions preceded the citizen suits. In neither case was the citizen suit prompted by state or federal agency inaction.

Furthermore, the Supreme Court's concern in *Gwaltney* that citizen suits for wholly past violations would undermine the supplementary role envisioned by Congress is equally applicable here. By the time Plaintiffs filed their federal

action, the Board and the City had not only entered into, but enforced, an Order requiring the City to implement a corrective action plan to bring it into compliance with the CWA, and the City had expended over a $1 million to that end. By the terms of the Order, the Board had agreed to forgo "civil penalties on the condition that the violator [the City] take some extreme corrective action, such as to install particularly effective but expensive machinery, that it otherwise would not be obliged to take." *Gwaltney*, 484 U.S. at 61. Thus, the true nature of Plaintiffs' suit in this case was not "interstitial" but "potentially intrusive" because the State had *not* "failed to exercise [its] enforcement responsibility." *Id.* at 60. In short, all of the concerns expressed in *Gwaltney* are present in this case, and point to the conclusion that, given the unique facts of this case, Plaintiffs in essence lacked standing to file suit.

At the same time, *Gwaltney* also recognized that standing is conferred by good faith allegations of continuous or intermittent violations. *Id.* at 64. We must therefore examine the complaint. As noted above, the complaint alleged that the City's frequent discharges of pollutants "past and present . . . caused Plaintiffs serious bodily injury and loss of value in Plaintiffs' property." As relief, the complaint sought merely "an Order compelling Defendants to provide remedial relief for all harm done as a result of the acts alleged herein, compensatory damages . . . , punitive damages . . ., the costs of this litigation . . . , and all further and general relief to which Plaintiffs are entitled." It is arguable whether Plaintiffs properly alleged continuing violations. *Cf. Gwaltney*, 484 U.S. at 64 (holding that the plaintiffs' complaint satisfied the jurisdictional requirements of § 505 and conferred standing because their complaint alleged in good faith that "Gwaltney was continuing to violate its NPDES permit when plaintiffs filed suit"). Although "slim," we nonetheless can give Lynch the benefit of the doubt and assume standing. *See Arizonans for Official English v. Arizona*, 520 U.S. 43, 66-67 (1997) (holding that a court assumes without deciding that standing exists in order to analyze mootness). As the *Gwaltney* Court

further noted, the mootness doctrine evens out the playing field. *See id.* at 66.

## 2. Mootness

As the district court observed in its order granting summary judgment, "[i]t is undisputed that the expansion of the treatment plant has remedied the overflow problem, since there is no evidence that any overflow has occurred since November 2000." The only overflows, which came to light because of the City's self-reporting, involved two manholes on Main Street, not into Bull Run Creek. Plaintiffs' complaint alleges violations pertaining to only Bull Run Creek.

Furthermore, although the City's discharge from its wastewater treatment plant exceeded its NPDES permit limits in February, March, and May 2001, shortly after the new wastewater system began operating, Defendants established that as of the time of summary judgment in November 2001, the City was in compliance with the NPDES permit. The City presented undisputed evidence from both the City Recorder, Hazel Gillenwater, and an environmental specialist for TDEC, John West, that the City had remedied the deficiencies in the operation of its wastewater treatment plant. In short, the City met its "heavy burden" of demonstrating that the alleged violations were not likely to recur, since they were largely caused by an outdated wastewater treatment plant, which had been replaced by the time Plaintiffs filed their federal action. At the same time, Plaintiffs have not met their burden as the nonmoving party on summary judgment of establishing a realistic prospect that the violations alleged in the complaint would continue, having presented no evidence to demonstrate recurrence. *Cf. Comfort Lake Ass'n. v. Dresel Contracting, Inc.*, 138 F.3d 351, 355 (8th Cir.1998) (holding that citizen plaintiffs offered no evidence to contradict stipulation agreement to the effect that defendant store construction was complete and NPDES permit had been terminated; stating that the plaintiff had therefore not met "its

burden to rebut the factual underpinnings of a well-supported motion for summary judgment"). In short, as the district court held, even if Lynch could survive the standing challenge, the case is moot, because the injuries suffered in the complaint had been remedied by events subsequent to the filing of the lawsuit, with no showing of a reasonable likelihood of recurrence.

*Laidlaw* is distinguishable. In *Laidlaw*, environmental groups brought suit against the holder of a NPDES permit, alleging violation of mercury discharge limits and seeking declaratory and injunctive relief. *Laidlaw*, 528 U.S. at 175-76. The Supreme Court held that the action would not be rendered moot by the company's compliance with its permit limits, or its closure of the challenged facility, absent a showing that either event made it absolutely clear that the permit violations could not reasonably be expected to recur, and remanded the case to the district court for further proceedings. *Id*. at 193.

However, in *Laidlaw*, in contrast with this case, the citizen suit was instituted prior to any action by a state agency, and thus was truly supplementary. *Id*. at 175-77. Further, in *Laidlaw*, the defendant company's lawyer reached a settlement with the state environmental agency on the last day before the 60-day notice period expired, so as to prevent the citizen suit, and the agreement required merely that the company pay $100,000 in civil penalties and make "every effort" to comply with its permit obligations. *Id*. at 177. Thus, in *Laidlaw*, there was a genuine concern that the defendant might be "free to return to its old ways" if the court were to find the claim moot based on the defendant's voluntary cessation of the challenged practice. *Id*. at 189. Here, although the City was not subject to a court order, its conduct was certainly not "voluntary" in the same sense as the defendant polluter in *Laidlaw*.

In this case, the record establishes that Plaintiffs were not compelled to file suit because of federal and state inaction.

The record reflects that, at the State's prompting, the City had, by the time of summary judgment, actually met its permit obligations by remedying the underlying problem, replacing an old wastewater treatment plant at substantial cost. Here, Plaintiffs had the opportunity before the district court at summary judgment to offer proof that the challenged practices were likely to continue, but failed to meet their burden under Rule 56.

Finally, the record also reflects that, in this case, it is the machinations of the citizen-plaintiffs, and not the defendant polluter, that appear to undermine the purposes and goals of the Act. Had Plaintiffs been truly compelled to commence litigation because of federal or state reluctance to solve a serious environmental problem, they would certainly have done so at least by 1998, when they filed suit in state court. Instead, they waited until the final chapter of the state agency proceedings to bring a CWA claim. The only plausible explanation for the timing of their federal suit is the possibility of reasonable costs and attorney fees. Indeed, at oral argument, counsel for Plaintiffs openly admitted that they were primarily interested in expert costs and attorney fees. However, because Plaintiffs never had a valid claim for civil penalties or injunctive relief, they cannot in any way be considered the "prevailing or substantially prevailing party," *see* 33 U.S.C. § 1365(d), attorney fees are not warranted in this case.[6]

---

[6]In *Buckhannon Bd. & Care Home v. West Virginia Dep't of Health & Human Servs.*, 532 U.S. 598 (2001), the Supreme Court held that the fee-shifting provisions of the Fair Housing Amendments Act and the Americans With Disabilities Act require a party to secure either a judgment on the merits or a court-ordered consent decree in order to qualify as a "prevailing party" for purposes of attorney fees, rejecting the catalyst theory. It is an open question whether the catalyst theory remains viable in the context of environmental statutes like the CWA that limit attorneys' fees to a prevailing party or *substantially prevailing party*. *See* Marisa L. Ugalde, *The Future of Environmental Citizen Suits After Buckhannon Board & Care Home, Inc. v. West Virginia Department of Health & Human Resources*, 8 ENVTL. LAW. 589, 614 (2002).

## B. RCRA Claim

Plaintiffs also argue that the district court erred in dismissing their RCRA claim. The district court concluded that dismissal was warranted because the relief available under the RCRA is no different than that available under the CWA.

Under 42 U.S.C. § 6972 of the RCRA, citizens are authorized to bring suit in substantially the same capacity as provided for in the CWA. 42 U.S.C. § 6972 (2001). Likewise, the relief available under § 6972 of the RCRA is virtually identical to that available under the CWA, i.e., injunctive relief, civil penalties, and attorney fees. *See* 42 U.S.C. § 6928(a). The RCRA, like the CWA, does not provide for compensatory damages. *See Mehrig v. KFC Western, Inc.*, 516 U.S. 479 (1996) (holding that RCRA does not authorize private cause of action to recover prior cost of cleaning up toxic waste); *Walls v. Waste Res. Corp.*, 761 F.2d 311, 316 (6th Cir. 1985). Thus, the district court did not err in dismissing the RCRA claim.

### III. Conclusion

For the foregoing reasons, the judgment of the district court is **AFFIRMED.**

### CONCURRING IN PART, DISSENTING IN PART

R. GUY COLE, JR., Circuit Judge, concurring in part and dissenting in part.

In holding that Lynch's suit is moot, the majority overlooks evidence in the record that establishes the existence of a genuine issue of material fact on whether the City has demonstrated that its alleged violations will not recur. The City must satisfy "the formidable burden of showing that it is *absolutely clear* the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167 (2000) (emphasis added). No doubt the City has demonstrated significant improvement in its wastewater treatment, but mere significant improvement falls short of the "absolutely clear" showing that the Supreme Court requires.

Indeed, in November 2001—nearly six months after suit was filed and after the City had completed both Phases I and II of the state's order—the state warned of the new plant's "very limited digester capacity." Although the state "underst[ood] that there are plans to convert the old final clarifies to digesters," this sheds no light on whether and when the plans would be implemented and exactly what those plans would entail—let alone that they would be successful. An undefined probability that current plant deficiencies may be cured in the future falls short of the City's burden under *Friends of the Earth*. And the state similarly expressed its "concern . . . about the status of the [City's] collection system rehabilitation program."

The majority relies heavily on the fact that the last violation took place in May 2001. But summary judgment was granted to the City only six months later. Given the City's years of chronic violations, this period of compliance is fairly brief,

and its significance is further undermined by the state's November report, which noted that "during the winter and spring . . . the flows may be much higher." The continued deficiencies in the City's facility, combined with the possibility of increased flows in the winter and spring, made premature a finding—based on only six months of compliance during the summer and fall—that the City had made it "absolutely clear" that all the problems had passed.

Nor does the state's determination that the City is in "substantial compliance" with its obligations necessarily shield the City from this suit. Our decision in *Jones v. City of Lakeland*, 224 F.3d 518, 524 (6th Cir. 2000) (en banc), made it clear that a seal of approval from the state of Tennessee does not automatically close the courthouse door for private individuals seeking to enforce federal clean-water statutes. We noted that in the Tennessee proceedings, "the plaintiffs and other similarly affected citizens are, at the discretion of the TDEC, denied access to both the courts and to a meaningful opportunity to participate at significant stages of the administrative decision-making process, to adequately safeguard their legitimate interests as mandated by the Clean Water Act." *Id.* at 522. We would not be faithful to *City of Lakeland* if the state's determination of "substantial compliance" required us to overlook the abovementioned evidence that the City's plant might still produce NPDES violations.

Finally, I disagree with the majority's emphasis on the plaintiffs' pursuit of attorneys' fees. It is unsurprising that Lynch's lawyer is interested in these fees—the whole purpose of fee-shifting statutes is to encourage attorneys to take cases that would otherwise be financially undesirable. That counsel is interested in compensation for his services does little to disparage the motivations of his client, Lynch, who seems reasonably to believe that the continued threat of prohibited toxic waste in his drinking water—even after the new plant was up and running—merits the intervention of the courts.

Although I believe that Lynch should be allowed to proceed to trial, I concur with the majority's dismissal of the suit by Ailor on grounds of standing. As for the balance of the majority's decision, I respectfully dissent.