**SIERRA CLUB, Plaintiff-Appellee,**

v.

**SIMKINS INDUSTRIES, INC., Defendant-Appellant.**

No. 87–1600.

United States Court of Appeals, Fourth Circuit.

Argued Nov. 4, 1987.

Decided May 31, 1988.

Rehearing and Rehearing In Banc Denied July 27, 1988.

---

David F. Albright, H. Thomas Howell (Semmes, Bowen & Semmes, Baltimore, Md., on brief), for defendant-appellant.

John F. King (G. Macy Nelson, Anderson, Coe & King, Baltimore, Md., on brief), for plaintiff-appellee.

Before WINTER, Chief Judge, ERVIN, Circuit Judge, and BUTZNER, Senior Circuit Judge.

HARRISON L. WINTER, Chief Judge:

Simkins Industries, Inc. (Simkins) appeals from a judgment entered against it in a citizen suit brought by Sierra Club pursu-

ant to § 505 of the Clean Water Act, 33 U.S.C. § 1365. The district court held that Simkins was liable under the Clean Water Act for failing to comply with the terms and conditions of Simkins' National Pollutant Discharge Elimination System (NPDES) permit by failing to file quarterly reports from August 1, 1981, to March 31, 1984, *Sierra Club v. Simkins Industries, Inc.*, 617 F.Supp. 1120 (D.Md.1985) (granting partial summary judgment on liability), and assessed civil penalties in the amount of $977,000 ($1,000 per day of violation). Simkins argues on appeal that Clean Water Act citizen suits may not be properly founded on such reporting violations and that citizen-plaintiff Sierra Club has not established a continuing violation within the meaning of *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.*, — U.S. ——, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987). We disagree. We also perceive no merit in Simkins' challenges to Sierra Club's standing; the district court's calculation of civil penalties; and the district court's denial of Simkins' belated motion for recusal. We therefore affirm the district court's judgment on liability and civil penalties.[1]

### I.

The Clean Water Act (Act), 33 U.S.C. §§ 1251 *et seq.* (1982 and West Supp.1988), originated in the Federal Water Pollution Control Act Amendments of 1972, 86 Stat. 816, "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Section 301(a) of the Act, 33 U.S.C. § 1311(a), generally prohibits the discharge of pollutants into navigable waters unless the point source has obtained a permit from the Environmental Protection Agency (EPA). Under a procedure established by Congress in § 402 of the Clean Water Act, 33 U.S.C. § 1342, the EPA Administrator may delegate to a state the authority to administer the NPDES program with respect to point sources in that state, and the source state may set more stringent minimum effluent levels supplanting federal standards. A violation of an NPDES permit, whether issued by state or federal officials, is a violation of the Act exposing the permit holder to liability under § 505 of the Act. *See Environmental Protection Agency v. California ex rel. State Water Resources Control Board*, 426 U.S. 200, 205, 96 S.Ct. 2022, 2025, 48 L.Ed.2d 578 (1976); 33 U.S.C. § 1342(k).

The State of Maryland is authorized by the EPA to administer the NPDES program for point sources in the State of Maryland. In particular, Maryland issues NPDES permits and is empowered to attach certain terms and conditions to these permits, including sampling and reporting requirements. Section 308 of the Clean Water Act, 33 U.S.C. § 1318, provides that recipients of such permits may be required to establish and maintain records, install monitoring equipment, and perform sampling, § 1318(a)(4)(A). It also authorizes the EPA Administrator or his or her authorized representatives a right of entry to an effluent source location or to premises where required records or monitoring equipment are kept, § 1318(a)(4)(B). A citizen suit must allege violation of "an effluent standard or limitation," 33 U.S.C. § 1365(a)(1), defined, *inter alia*, to mean "a permit or condition thereof issued under section 1342 ...," § 1365(f)(6).

In 1981, the Office of Environmental Programs of the Maryland Department of Health and Mental Hygiene issued Simkins a permit pursuant to 33 U.S.C. § 1342 for

---

**1.** Decision in this appeal was stayed pending the Supreme Court's decision in *Gwaltney* (citizen-plaintiff suits pursuant to § 505 of the Clean Water Act may not be based upon wholly past violations), and again stayed by motion of the parties pending ongoing settlement negotiations. Because we now have the benefit of the Supreme Court's guidance in *Gwaltney* and because the parties have reported their inability to reach a settlement, we proceed to decision.

After oral argument, the United States moved for limited intervention to insure that any civil penalties assessed in this action be made payable to the United States Treasury. On April 22, 1988, we denied the government's motion without prejudice to another application if future circumstances demonstrate that it is necessary for the government to seek protection of its interests.

its paper mill in Catonsville, Maryland, on the bank of the Patapsco River. Simkins' paper mill manufactures cardboard, and in the course of operation Simkins discharges treated waste from its plant into the Patapsco River. *See* 617 F.Supp. at 1123. The NPDES permit allowing Simkins to discharge this waste was conditioned upon maximum daily and quarterly averages in levels of oil and grease. The permit also required Simkins to monitor at locations near its plant the levels and volume of flow of oil and grease, as well as other effluents such as copper, total organic carbon, and total phenol. The permit required Simkins to sample on a monthly basis and to summarize and file accurate results with the Office of Environmental Programs in quarterly Discharge Monitoring Reports (DMRs). *See* 40 C.F.R. §§ 122.41($l$)(4)(i); 122.22(b), (d).

It is undisputed that Simkins failed to sample and to file the quarterly DMRs for a period of over two years. The district court heard testimony that the plant manager's supervisor did not regard sampling as a "priority."

The Sierra Club filed its citizen suit on October 31, 1984. It sought declaratory relief, injunctive relief, and civil penalties of $10,000 per day of violation, alleging that Simkins' failure to report constituted a separate violation for each day it occurred. The district court granted Sierra Club's

motion for partial summary judgment, and subsequently fixed civil penalties.[2]

## II.

■ Simkins challenges Sierra Club's Article III standing to sue as a private attorney general seeking enforcement of the Clean Water Act under the Act's citizen suit provisions, 33 U.S.C. § 1365. In its complaint, Sierra Club alleged that health, recreation, aesthetic, and environmental interests of its members were and were going to be adversely affected by Simkins' failure to comply with the terms and conditions of its NPDES permits. Sierra Club submitted the affidavit of member John Railey attesting to his interest, as one regularly using and enjoying the Patapsco River and surrounding land, in preserving the environmental integrity of the river.[3] Simkins argues that Sierra Club has not shown injury under Article III fairly traceable to Simkins' failure to sample and file DMRs, and that Sierra Club's citizen suit is violative of the Article III requirement that a plaintiff's injury be redressed by the requested relief. We disagree with both contentions.

## A.

■ Sierra Club maintains that its members have been injured by Simkins' reporting violations because they are unable to

2. The district court deferred decision on liability, awaiting our decision in *Gwaltney* as to whether civil penalties under Section 309(d) of the Act, 33 U.S.C. § 1319(d), can be assessed per day of violation. *See Chesapeake Bay Foundation, Inc. v. Gwaltney of Smithfield, Ltd.*, 791 F.2d 304, 314–15 (4 Cir.1986) (civil penalties may be assessed on a daily basis), *vacated on other grounds,* —— U.S. ——, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987); § 1319(d) ("shall be subject to a civil penalty not to exceed $10,000 per day of such violation"). The district court then concluded that Simkins' failure to comply with its NPDES permit exposed Simkins to a maximum penalty of $9,770,000, $10,000 for each day of violation, and exercised its discretion in assessing a penalty of $1,000 for each day of violation.

3. Simkins' suggestion that Mr. Railey's affidavit was too vague to support summary judgment is not well-founded. The affidavit was sufficiently specific to allege Article III injury in stating:

My interest, use or enjoyment of the Patapsco River and surrounding area includes preserving the health, safety and welfare of the river basin, preserving marine life and water integrity within the river, and eliminating odorous and unsightly illegal pollution. I regularly hike along the river. My activities and interests with respect to the Patapsco River have been adversely affected physically, aesthetically and emotionally by Simkin's [sic] Industries' failure to comply with its NPDES permit and resulting illegal pollution.

Finally, I have an interest in monitoring the discharge of effluents into the Patapsco River.

A. 112. Simkins presents no reason to doubt the truth of Mr. Railey's affidavit. The district court was not presented with such a challenge, and thus did not have occasion to review any evidence underlying Mr. Railey's affidavit. Under these circumstances, we accept as true statements made in the affidavit. *See Chesapeake Bay Foundation v. American Recovery Co.,* 769 F.2d 207, 209 n. 1 (4 Cir.1985) (per curiam).

know the full extent of pollution in the river near Simkins' paper mill. Mr Railey's articulated interests include aesthetic and environmental interest which can constitute injury in fact. *Sierra Club v. Morton*, 405 U.S. 727, 734–35, 92 S.Ct. 1361, 1366, 31 L.Ed.2d 636 (1972). Of course, Congress' provision for citizens suits does not, in itself, establish Article III standing; Sierra Club must establish that one or more of its members use the Patapsco River and would be adversely affected by its pollution. *See Sierra Club v. SCM Corp.*, 747 F.2d 99, 107 (2 Cir.1984) (to establish standing under § 505 of the Act, Sierra Club required to demonstrate actual injury within the meaning of *Morton*).

■ John Railey's affidavit adequately establishes injury and the threat of future injury,[4] stemming from both Simkins' failure to report concerning harmful effluents for which its permit contained maximum discharge levels and Simkins' failure to report concerning the levels of other effluents for which it was not subject to discharge limitations. As a result of these violations, information on any harmful level of pollutants in the area of Simkins' plant during this time period is forever lost to environmental planners and policymakers and those who might undertake to remedy the effects of any pollution. Moreover, Simkins' failure to report on levels of harmful effluents subject to maximum discharge limitations threatens Mr. Railey's prospective interest in protecting the environmental integrity of the Patapsco River and curtailing any ongoing unlawful discharges into its waters. The actual injury stemming from reporting and sampling violations, coupled with the threatened injury stemming from failure to report on maximum levels of harmful effluents, establishes injury traceable to Simkins' actions.

### B.

Simkins also contends that the Clean Water Act's provision for civil penalties unconstitutionally provides a remedy which does not address the Sierra Club's injury, maintaining that Sierra Club has failed to establish "the causal connection between the alleged injury and the judicial relief requested." *Allen v. Wright*, 468 U.S. 737, 753 n. 19, 104 S.Ct. 3315, 3325 n. 19, 82 L.Ed.2d 556 (1984).

■ It is true, as the Supreme Court has observed, that Congress' provision for citizen suits in § 1365

> necessarily includes ... plaintiffs seeking to enforce these statutes as private attorneys general, whose injuries are "noneconomic" and probably noncompensable....

*Middlesex County Sewerage Authority v. National Sea Clammers Association*, 453 U.S. 1, 17, 101 S.Ct. 2615, 2624, 69 L.Ed.2d 435 (1981). However, the judicial relief of civil penalties, even if payable only to the United States Department of the Treasury, is causally connected to a citizen-plaintiff's injury. Such penalties can be an important deterrence against future violations.[5] Members of Sierra Club must show actual or threatened injury traceable to the wrong and a particularized interest in deterring violations of the Act, but once they have done so, the imposition of civil penalties is causally connected to the injury. *See Student Public Interest Research Group, Inc. v. AT & T Bell Laboratories*, 617 F.Supp. 1190, 1200–01 (D.N.J.1985) (money damages awarded in Clean Water Act citizen suit made payable to U.S. Treasury did redress plaintiff's injury in the form of general deterrence).

---

**4.** *See Valley Forge Christian College v. Americans United For Separation of Church & State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (threatened rather than actual injury can meet minimum Article III standing requirements).

**5.** The district court was of course not obligated to find that Sierra Club's lawsuit had a specific, immediate deterrent effect in this case in order to find that Article III standing existed. It is, however, interesting to note that Simkins commenced compliance with its reporting obligations under the Clean Water Act shortly after Sierra Club notified Simkins in a letter dated August 31, 1984, pursuant to 33 U.S.C. § 1365(b)(1)(A)(iii), of its belief that Simkins was failing to comply with permit requirements.

### III.

Before the Supreme Court's decision in *Gwaltney,* the district court held that the Clean Water Act authorized citizen suits for imposition of civil penalties for past violations. 617 F.Supp. at 1126–27, 1131–32. In a supplemental memorandum filed after the Supreme Court's decision in *Gwaltney,* Simkins contends that *Gwaltney* compels reversal of the district court's decision. On this record, we think that only one conclusion is possible, as a matter of law, as to whether § 1365(a) encompasses this citizen suit, and accordingly neither reversal is indicated nor is there need to remand the case to the district court for further findings. Upon due consideration of the parties' supplemental memoranda on *Gwaltney's* application to this appeal, we conclude that Sierra Club has alleged in good faith and proved a continuing violation within the meaning of *Gwaltney.*

In *Gwaltney,* the Supreme Court held that citizen-suits could not be based upon wholly past violations, but distinguished wholly past violations from allegations of intermittent or sporadic violations. On remand from the Supreme Court, we have ruled that while the Supreme Court held that good faith allegations were sufficient to meet threshold jurisdictional challenges, the Supreme Court also stated that in order to prevail, a citizen-plaintiff must prove a continuing violation. *See Chesapeake Bay Foundation, Inc. v. Gwaltney of Smithfield, Ltd.,* 844 F.2d 170 (4 Cir.1988).

■ At the outset of this lawsuit, Sierra Club alleged in good faith a continuing violation of the Clean Water Act. In a letter dated August 31, 1984, and incorporated by reference in paragraph 14 of plaintiff's complaint, Sierra Club alleged continuing reporting violations of the Clean Water Act. *See* 33 U.S.C. §§ 1318, 1365(a)(1)(A), 1365(f)(6).[6]

It is also beyond dispute that Sierra Club proved a continuing violation of an effluent standard or limitation under 33 U.S.C. § 1365(a)(1)(A). Simkins was required to sample on a monthly basis and maintain records of its sampling activities. The DMR Simkins filed in the fall of 1984 did not include sampling data for the months of July and August of 1984, and therefore could not include accurate quarterly averages. Simkins did not file a complete DMR until January 15, 1985, almost three months after Sierra Club filed its suit on October 31, 1984.

More significantly, Simkins was required, as a general condition of its permit, to retain records of its sampling:

*Records Retention*

All records and information resulting from the monitoring activities required by this permit, including all records of analyses performed, calibration and maintenance of instrumentation, and original recordings from continuous monitoring instrumentation *shall be maintained for a minimum of three (3) years.* This period shall be automatically extended during the course of litigation, or when requested by DHMH [Department of Health and Mental Hygiene].

NPDES Permit No. MD0058033, general condition II(A)(7) (emphasis added). On and after October 31, 1984, the day the Sierra Club filed its citizen suit, Simkins failed to maintain records of monthly sampling it was obligated to perform prior to September 30, 1984, as required by 33 U.S.C. § 1318 and the record retention provision of its permit.[7]

---

**6.** In the August 31, 1984, letter, the so-called sixty-day letter of 33 U.S.C. § 1365(b), the Sierra Club placed Simkins on notice that it believed Simkins "has violated and continues to violate" the terms of the permit, and proceeded to list reporting violations that had occurred to date. Sierra Club of course did not list reporting violations that had not yet occurred and therefore were not known to it. It was sufficient to allege a continuous series of reporting violations coupled with an allegation that Simkins was con-

tinuing to violate its permit's terms and conditions.

**7.** The district court did not consider whether Simkins failure to maintain records and whether Simkins failure to file complete DMRs until after Sierra Club filed suit constituted continuing violations of the Act. It calculated civil penalties based on reporting violations up until March 31, 1984. Sierra Club has not requested remand for extension of the time period the district court employed for determining civil

■ It is true that Simkins' failure to sample occurred solely before Sierra Club filed suit, but Simkins' monitoring obligations were not designed to be a mere academic exercise. Simkins was bound by the reporting and records retention requirements of the NPDES permit that are central to adequate administration and enforcement of limits on substantive discharges under the Clean Water Act. Unless a permit holder monitors as required by the permit, it will be difficult if not impossible for state and federal officials charged with enforcement of the Clean Water Act to know whether or not the permit holder is discharging effluents in excess of the permit's maximum levels. Congress has provided that these records be made generally available, with some exceptions, to the Administrator, the public, and to Congressional committees. *See* 33 U.S.C. § 1318.[8] Simkins cannot successfully defend against its failure to file complete DMRs or retain records by noting that the underlying data was never collected in the first instance. In this context, where the permit expressly establishes a continuing obligation to retain records and file complete DMRs, to allow such a defense to jurisdiction would effectively provide a permit holder with the opportunity to escape liability under § 1365(a) by failing at the outset to sample and to create and retain the necessary monitoring records on possibly harmful and unlawful effluent discharge levels.

Because we conclude that Simkins' violations continued past the date Sierra Club filed its complaint, we do not reach the issue of whether they were intermittent or episodic violations which did not cease to be continuous within the meaning of *Gwaltney.*

## IV.

■ In the district court, Sierra Club successfully maintained that Simkins' undisputed failure to file quarterly DMRs for over thirty consecutive months violated the Act, 33 U.S.C. §§ 1318, 1365. Simkins challenges this holding, arguing that the phrase "an effluent standard or limitation" of § 1365(a) should be construed to exclude citizen suits that do not allege discharge of pollutants in violation of permit limitations. We disagree.

Section 1365 defines an "effluent standard or limitation" to include "a permit or condition thereof issued under section 1342 of this title." § 1365(f)(6). As we said in *Menzel v. County Utilities Corporation,* 712 F.2d 91 (4 Cir.1983):

> a discharger that fails to file [DMRs], or fails to file accurate reports, would be in violation of its NPDES permit and would be subject to citizens' suit under 33 U.S.C. § 1365.

*Id.* at 94; *see also Pymatuning Water Shed Citizens for Hygienic Environment v. Eaton,* 506 F.Supp. 902 (W.D.Pa.1980) (awarding injunctive relief in citizens suit not alleging discharges in violation of permit levels), *aff'd,* 644 F.2d 995 (3 Cir.1981). Simkins' reporting requirements are expressly made conditions of its permit, and therefore violations of these conditions, by operation of § 1365(f)(6), are violations of an effluent standard or limitation of § 1365(a).[9]

penalties, and we see no reason, in light of the district court's decision to assess substantially less than the maximum possible civil penalties, to revise the district court's calculations.

8. Required reports such as DMRs may be used as admissions in court to establish a defendant's liability. *See Chesapeake Bay Foundation v. Bethlehem Steel Corp.,* 608 F.Supp. 440, 451 (D.Md.1985).

9. Simkins' efforts to distinguish substantive discharge limitations from reporting requirements therefore fails in light of the plain language of § 1365(f)(6). Its argument is also unpersuasive because, as above, the reporting requirements of

the Act and Simkins' NPDES permit are essential elements of the Clean Water Act's enforcement procedures. Sampling data is useful, independent of ascertaining compliance with maximum discharge limitations, to enable government officials and others to monitor potentially harmful trends and adjust their future course of action accordingly. *See* 33 U.S.C. § 1318(a)(4)(B) (Administrator shall have access to records at reasonable times); § 1318(b) (records shall be made available upon request to the public with limited exceptions); § 1318(d) (records shall be made available upon request to committees of Congress). For example, Simkins' permit required it to collect infor-

## V.

■ Simkins contends that the Sierra Club should be estopped from seeking civil penalties in excess of the approximate cost of an environmental survey, $130,000, which counsel for Sierra Club mentioned at trial. We disagree. Sierra Club requested $10,000 per day of violation in its complaint, and we have held that such daily penalties can be imposed. *See Gwaltney*, 791 F.2d at 313–15. Sierra Club's complaint, not the informal comments of its counsel at trial, constitute the formal request for damages. More importantly, the district court has wide discretion in determining civil penalties which cannot be limited by trial counsel's oral arguments.

■ Simkins further argues that Sierra Club should be judicially estopped from money damages greater than its purported trial request for only $130,000 in damages because the Sierra Club used this request to prevail in a dispute over the admission of certain expert testimony on the actual level of pollutants in the Patapsco River near Simkins' paper mill. It is not clear that Sierra Club's mention of lower money damages than the civil penalties requested in the complaint or awarded by the district courts is accurately characterized as a formal request to limit the magnitude of civil penalties.[10] It is clear that the district court did not rule on admissibility of the expert testimony on the basis of Sierra Club's mention of a hypothetical number. The district court properly concluded, in the exercise of its broad discretion as to the admission of evidence, that testimony concerning the actual level of pollutants was relevant to its determination of what penalty should be imposed. Its ruling was not dependent upon the amount Sierra Club mentioned during oral argument as a possible assessment.[11] *See Simkins*, 617 F.Supp. at 1131 (current compliance with Act may be considered in assessing amount of penalties).

## VI.

The district judge, Judge Murray, had joined the Sierra Club in 1969, but he resigned in 1971 upon his appointment to the bench, maintaining no further contact with the organization. Judge Murray's prior association with plaintiff's organization thus ended thirteen years before this case commenced. Judge Murray was commendably forthright in informing the litigants in pretrial conference of his prior membership in the Sierra Club. His ensuing offer to recuse himself from the case was not accepted by Simkins' counsel. Simkins now contends that the district court erred in deny-

mation on the levels of copper at certain monitoring locations despite the absence of a maximum quarterly, monthly, or daily average on copper in the NPDES permit. At the trial on damages, plaintiff presented evidence of unsafe levels of copper in the river near Simkins' plant.

10. We are not convinced that Sierra Club counsel sought to limit his client's request for civil penalties by arguing to the district court as follows:

[Your Honor has] the power, we submit, to assess penalties in the amount of $130,000. We are not asking that. We are only asking that you provide monies ... for ... the survey ... to determine what the impact of this industry's functioning on that river site has been during the period of time they have not reported.

A. 153–54. By way of summation of its admissibility argument, Sierra Club argued that it would be "entirely reasonable for the Sierra Club to ask that the industry *at least* pay that amount...." A. 154 (emphasis added). Sierra Club's use of the number $130,000 appears to be

not an effort to buy admissibility of its testimony by lowering its money damages request, but rather a hypothetical number used in its argument that the testimony was relevant to the district court's civil penalties determination.

11. Additionally, Simkins contends that the district court improperly included the first 93 days of the period of noncompliance, arguing that at worst it was in noncompliance with its quarterly reporting requirements beginning October 28, 1981. Simkins' obligations under the NPDES permit extended beyond filing of quarterly reports to the actions necessary to make filing of the DMRs possible, including installation and regular use of sampling equipment and the maintenance of records recording the results of monitoring. The district court found that from the date the NPDES permit was effective, July 27, 1981, Simkins failed from the time the permit was made effective to comply with the permit's specified conditions. Thus the district court did not abuse its broad discretion in finding that the period of noncompliance commenced July 27, 1981.

ing its post-trial motion for recusal, arguing that a reasonable person, knowing reasonably ascertainable facts, would harbor doubts about Judge Murray's impartiality, *see United States v. Carmichael,* 726 F.2d 158, 160 (4 Cir.1984), and that the district court erred in failing to make its offer of recusal on the record. We conclude that the district court's impartiality may not be fairly questioned in this case and that the court did not err in failing to make its offer of recusal on the record.

### A.

■ We agree with the district court's holding that such prior association does not, in itself, form a reasonable basis for questioning a judge's impartiality. *See Maier v. Orr,* 758 F.2d 1578, 1581 (Fed.Cir. 1985) (trial judge's former association with Air Force does not reasonably raise appearance of partiality); *Brody v. President & Fellows of Harvard College,* 664 F.2d 10, 11 (1 Cir.1981) (trial judge's graduation from defendant university does not in itself constitute reasonable basis for recusal motion), *cert. denied,* 455 U.S. 1027, 102 S.Ct. 1731, 72 L.Ed.2d 148 (1982). As the *Brody* court persuasively reasoned, litigants are entitled to a judge free of personal bias, but not to a judge without any personal history before appointment to the bench.

Simkins seeks to distinguish *Maier* and *Brody* on the basis that, unlike the Air Force or a university, the Sierra Club has been "judicially noticed out" as a single-issue advocacy group. The Judicial Conference of the United States has suggested that judicial officers resign from organizations such as the Sierra Club, the Anti–Defamation League of B'nai B'rith, and the National Association for Advancement of Colored People, as groups which "regularly engage in adversary proceedings" in federal court.[12] However, it does not follow that federal judges who are former members of one of these groups may not preside in disputes in which the group is a party. To the contrary, one can infer that

resignation is deemed appropriate in order generally to allow former members to preside in federal court proceedings involving these expansive organizations. We have no difficulty concluding that a brief association with the Sierra Club terminated over a decade before adversary proceedings commenced does not form a basis for reasonably questioning a district judge's impartiality.

### B.

Simkins sought recusal through new counsel after an adverse judgment had been entered, arguing that Simkins should not be bound by its former counsel's waiver of Judge Murray's offer of recusal. Simkins presented evidence that its counsel had told it before the pretrial conference that the judge may have been associated with the Sierra Club and that, were this to be the case, counsel would seek the district judge's recusal. Simkins contends that when it heard no more from its former counsel on this matter, it reasonably relied upon counsel's silence as an indication that the judge was not a former member. It argues that its former counsel's alleged error was compounded by the district court's failure to make its offer of recusal on the record.

■ This line of argument is without merit for two reasons. First, Simkins argument is that it reasonably relied on its former counsel's failure to communicate the fact of the district judge's prior affiliation with plaintiff as an indication that the judge was not a former member. However, Simkins wishes not to be bound by its reliance on its former counsel's tactical decision not to accept the judge's offer to recuse himself. Ordinarily civil litigants are bound by their lawyers' tactical decisions, and we see no reason to depart from this rule in this case. Especially is this so because Simkins' motion for recusal was made after entry of adverse judgment, so that the equities do not militate in favor of Simkins.

**12.** *See* Judicial Conference of the United States, Advisory Comm. on Judicial Activities, Adv. Op. No. 40 (Jan. 10, 1975).

Secondly, Simkins' assumption that the district judge was required to offer to recuse himself on the record is incorrect. Subsection 455(e) does provide that acceptance of a litigant's waiver of a § 455(a) offer of recusal must be preceded by a "full disclosure on the record of the basis for disqualification." However, § 455(a) by its terms is applicable only when a judge's impartiality "might reasonably be questioned." As we have said, we do not think the district judge's impartiality may be reasonably questioned on the basis of the trial judge's brief membership in the Sierra Club over a decade before this case was tried. His disclosure of his prior affiliation with plaintiff was therefore not required under § 455(a). It follows that the on-the-record requirement for acceptance of waivers under § 455(e) is not applicable.

AFFIRMED.