*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 04a0377p.06

# UNITED STATES COURTS OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

AMERICAN CANOE ASSOCIATION, INCORPORATED;
SIERRA CLUB,

                            *Plaintiffs-Appellants,*

           *v.*

CITY OF LOUISA WATER & SEWER COMMISSION; LOUISA
WATER TREATMENT PLANT; CITY OF LOUISA,
KENTUCKY,

                         *Defendants-Appellees.*

> No. 02-6018

———————————

Appeal from the United States District Court
for the Eastern District of Kentucky at Ashland.
No. 01-00099—Henry R. Wilhoit, Jr., District Judge.

Argued: December 4, 2003

Decided and Filed: November 1, 2004

Before: KENNEDY, MARTIN, and MOORE, Circuit Judges.

———————————

### COUNSEL

———————————

**ARGUED:** Sarah A. Adams, TERRIS, PRAVLIK & MILLIAN, Washington, D.C., for Appellants. Eldred E. Adams, Jr., ADAMS & ADAMS, Louisa, Kentucky, for Appellees. **ON BRIEF:** Bruce J. Terris, Demian Asa Schane, TERRIS, PRAVLIK & MILLIAN, Washington, D.C., for Appellants. Eldred E. Adams, Jr., ADAMS & ADAMS, Louisa, Kentucky, for Appellees.

     MARTIN, J., delivered the opinion of the court, in which MOORE, J., joined. KENNEDY, J. (pp. 9-11), delivered a separate opinion concurring in part and dissenting in part.

———————————

### OPINION

———————————

     BOYCE F. MARTIN, JR., Circuit Judge. Pursuant to the citizen-suit provision of the Clean Water Act, 33 U.S.C. § 1365, American Canoe Association and Sierra Club filed a complaint on both their own behalf and their members' behalf alleging that the defendants violated the terms of the National Pollutant Discharge Elimination System permit issued to the City of Louisa Water & Sewer Commission and, in so doing, also violated the Act. The district court dismissed the complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of standing. For the reasons that follow, we REVERSE the judgment of the district court and REMAND for further proceedings consistent with this opinion.

**I.**

**A.**     *Statutory Background*

In 1972, Congress enacted the Clean Water Act with the stated objective of "restor[ing] and maintain[ing] the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). In order to achieve this laudable goal, "the Act prohibits 'the discharge of any pollutant by any person' unless done in compliance with some provision of the Act." *S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe*, 124 S. Ct. 1537, 1541 (2004) (quoting 33 U.S.C. § 1311(a)). Thus, the Act authorizes the issuance of National Pollutant Discharge Elimination System permits—commonly referred to as "NPDES permits"—which "place limits on the type and quantity of pollutants that can be released into the Nation's waters." *Id.* Additionally, permit-holders are generally required both to monitor their effluent discharges and to report these results. *See* 33 U.S.C. § 1318(a) (noting that monitoring and reporting requirements may be imposed when necessary to fulfill the objectives of the Act). If monitoring and reporting requirements are imposed, the Act requires that the information collected be available to the public unless disclosure would expose a trade secret. 33 U.S.C. § 1318(b).

"Congress enlisted the help of the public in attaining [the Act's] goal by authorizing citizens to bring suits against those who violated the Act." *Pub. Interest Res. Group of New Jersey, Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 114 (3d Cir. 1997). "Citizen suits are merely intended to supplement, not supplant, enforcement by state and federal government agencies." *Ailor v. City of Maynardville, Tenn.*, 368 F.3d 587, 591 (6th Cir. 2004). Noncompliance with a National Pollutant Discharge Elimination System permit constitutes a violation of the Act, such that the citizen-suit provisions are triggered. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. Inc.*, 528 U.S. 167, 174 (2000).

**B.**     *Factual Background*

On May 21, 2001, American Canoe and Sierra Club, which are national, not-for-profit organizations dedicated to the protection of the environment, filed a complaint against the City of Louisa Water & Sewer Commission and the Louisa Water Treatment Plant alleging violations of the Clean Water Act. On August 17, the plaintiffs amended their complaint to add the City of Louisa as a defendant. This opinion will collectively refer to these entities as the "defendants" unless further explanation is necessary. The complaint alleged that the defendants failed to comply with the terms of the National Pollutant Discharge Elimination System permit issued by the Kentucky Department for Environmental Protection to the City of Louisa Water & Sewer Commission, which authorized the discharge of a specified level of effluents into the Levisa Fork of the Big Sandy River and imposed monitoring and reporting requirements.

American Canoe sued on behalf of its members alleging that their "health, economic, recreational, aesthetic and environmental interests" are adversely affected by the defendants' discharge, monitoring, and reporting violations. Additionally, American Canoe sued on its own behalf alleging that the defendants' monitoring and reporting violations adversely affected its organizational interests. In support of its allegations, American Canoe provided the affidavit of David Jenkins, the Director of Conservation and Public Policy for American Canoe, which stated that American Canoe and its members' interests were harmed by the defendants' monitoring and reporting violations.

Sierra Club made similar allegations, but substantiated them with the affidavit of Daniel Hurst Kash, a resident of Ashland, Kentucky and member of Sierra Club since 1975. Kash alleged that he had recreated in the Big Sandy River near Louisa in the past and would like to do so in the future, but maintained that he refuses to recreate there currently because of the pollution. The Sierra Club also provided the affidavit of Lane E. Boldman, the Chair of its Cumberland Chapter, stating that the interests of Sierra Club were adversely affected by the defendants' monitoring and reporting violations.

The defendants filed a motion to dismiss arguing that the plaintiffs lacked standing. The district court granted the motion on June 11, 2002, holding that the plaintiffs lacked standing because none of its members had standing to sue in their own right. Thereafter, the plaintiffs filed a motion for reconsideration pursuant to Federal Rule of Civil Procedure 59(e), which the district court denied on July 25. This timely appeal followed.

## II.

This Court reviews a district court's dismissal of a complaint for lack of standing as it reviews other dismissals pursuant to Federal Rule of Civil Procedure 12(b): *de novo*. *Jones v. City of Lakeland, Tenn.*, 224 F.3d 518, 520 (6th Cir. 2000). Thus, this Court must accept as true all material allegations contained in the complaint and liberally construe them in favor of the complaining party. *Kardules v. City of Columbus*, 95 F.3d 1335, 1346 (6th Cir. 1996); *Warth v. Seldin*, 422 U.S. 490, 501 (1975).

### A.     *Representational Standing*

Plaintiff Sierra Club argues that it has standing to sue as the representative of its members. Although American Canoe originally sued on its own behalf and in its representational capacity, it does not argue on appeal that it has standing to sue in its representational capacity. Sierra Club has standing to sue on behalf of its members when "its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Laidlaw*, 528 U.S. at 181. A member of Sierra Club would have standing to sue in his own right when he has suffered a concrete and particularized injury in fact that is fairly traceable to the defendant's actions and a favorable decision would redress his injury. *Ailor*, 368 F.3d at 596. The district court concluded that Sierra Club did not have standing to sue in its representational capacity because it could not establish that any of its members would have standing to sue in their own right. We disagree.

Sierra Club provided the affidavit of a member, Daniel Kash, in support of its standing to sue as the representative of its members for the defendants' violations of the Act. Kash's affidavit contained the following pertinent averments:

¶ 3.    For many years I traveled to Louisa, Kentucky, which borders the Big Sandy River, as part of my duties as supervisor, Kentucky Division of Air Quality, State of Kentucky. I made this trip once per week. On many of these occasions I thought to myself what a terrible shame it was that the Big Sandy River was so polluted that I could not fish it, canoe it, or swim in it. As an avid fisherman this was emotionally upsetting to me.

¶ 4.    Almost from the beginning of these trips, I was aware that the Louisa Water Treatment Plant was violating water pollution standards . . . . The river appeared to be dark and oily and smelled like petroleum products . . . .

¶ 6.    About 10 years ago, I went canoeing on the Big Sandy River near Louisa. However, the water pollution and odor emanating from the River detracted from my enjoyment and, for this reason, I have not attempted to recreate on the River since then.

¶ 7.    I will not currently fish or canoe in the Big Sandy River near Louisa. I do fish in the Ohio River about 12 miles downstream from the confluence of the Big Sandy River and the Ohio River. If the Big Sandy River near Louisa were not as polluted as it currently is, I would canoe and fish in it. In my opinion, not being able to canoe and fish on the Big Sandy River is a great loss to me and every other citizen in Kentucky.

¶ 8.    Counsel for plaintiffs has informed me that the Louisa Waste Water Plant is violating its permit discharge limits, including for total suspended solids and oil and grease. I am very concerned about the harmful impacts that this pollution will continue to have on the water quality of these waters, including its fish and plant life.

¶ 9.    I am interested in obtaining correct information about the amount of pollution in the Big Sandy River near Louisa so that I can make decisions about whether it is safe to fish, paddle, and recreate in this waterway. If the Louisa Water Treatment Plant and other dischargers do not monitor and report the pollution they discharge in accordance with their permits, this information will not be available . . . .

### 1.        **Aesthetic/Recreational Injury**

The district court concluded that Kash had alleged only a generalized grievance and not an actual, individualized injury because it apparently found that Kash was not a person "for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *Laidlaw*, 528 U.S. at 183 (internal quotation marks omitted). We conclude otherwise.

The plaintiffs in *Laidlaw*, Friends of Earth and Citizens Local Environmental Action Network, brought a complaint against Laidlaw Environmental Services, Inc., alleging that Laidlaw had violated its National Pollutant Discharge Elimination System permit and seeking injunctive and monetary relief for the violation. *Id.* at 175-76. The Court found that the affidavits supplied by the plaintiffs' members had established an injury in fact. *Id.* at 183-84. In this case, Kash's averments are virtually indistinguishable from those that the Court found sufficient to establish an injury in fact in *Laidlaw*.

For example, in *Laidlaw*, the Court upheld the standing of Friends of the Earth member, Norman Sharp, who averred that he "canoed approximately 40 miles downstream of the Laidlaw facility and would like to canoe in the North Tyger River closer to Laidlaw's discharge point, but did not do so because he was concerned that the water contained harmful pollutants." *Id.* at 183. Similarly, Kash averred that he fished twelve miles downstream, but would canoe on the Big Sandy River had it not been so polluted. Moreover, although Kash lives in Ashland, Kentucky, and not in Louisa, Kentucky, such a fact is not dispositive under *Laidlaw* because Kash has demonstrated an interest in canoeing and fishing in the affected area. *See id.* at 182 (noting that affiant Linda Moore lived twenty miles from the area in question, but that she would like to use the affected area). Kash averred that he had recreated in the affected area in the past and that he would recreate there currently, were it not for the pollution caused by the defendants' discharge of effluents in excess of the limitations imposed by the National Pollutant Discharge Elimination System permit. Under the Court's current environmental standing doctrine, Kash's averments adequately alleged that he suffered an injury in fact to his aesthetic and recreational values. *See id.* at 183 ("We have held that environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity.") (citing *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)).

### 2.        **Informational Injury**

We also conclude that Sierra Club has standing to sue for its members' informational injuries. The averments of its member, Kash, establish that the lack of information caused an injury beyond the "common concern for obedience to law." *L. Singer & Sons v. Union Pac. R. Co.*, 311 U.S. 295, 303 (1940). Kash attested that the lack of information deprived him of the ability to make choices about whether it was "safe

to fish, paddle, and recreate in this waterway." These allegations are sufficient to establish that Kash has suffered a concrete and particularized injury sufficient to confer Article III standing.[1]

### 3.          Causation & Redressability

Sierra Club has also demonstrated that the injury in fact suffered by Kash is "fairly traceable to the . . . allegedly unlawful conduct [of the defendants] and likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751 (1984). The causation requirement of the constitutional standing doctrine exists to eliminate those cases in which a third party and not a party before the court causes the injury. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) ("[T]he injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.'") (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976)). The defendants argue that the Sierra Club has not sufficiently alleged causation because "[t]here is absolutely no evidence of any connection between anything going on at the Louisa Water Plant and the various things in the river that are so troubling to Mr. Kash." This argument lacks merit.

Sierra Club has alleged an ongoing violation of the Clean Water Act in that the defendants repeatedly violated the terms of the National Pollutant Discharge Elimination System permit issued to the City of Louisa Water & Sewer Commission by exceeding the effluent limitations and failing to monitor and report the effluent discharges. Notably, the defendants have not challenged these allegations and, given the procedural posture of this case, we must accept these allegations as true. As to Kash's informational injury, because the injury itself is the lack of information, it necessarily follows that the defendants' actions in failing to follow its monitoring and reporting obligations, which deprived Kash of the information, "caused" or is "fairly traceable" to the alleged injury.

As to Kash's aesthetic and recreational injury, we similarly conclude that the alleged injury is fairly traceable to the defendants' actions. Kash's affidavit noted that the Big Sandy River appeared "dark and oily and smelled like petroleum products" and that it had an unpleasant odor. Sierra Club alleged that the defendants exceeded the effluent limitations contained in the discharge permit on numerous occasions and presented evidence that these specific types of effluent discharges could cause conditions similar to that complained of by Kash. *See* J.A. 157 (affidavit of Dr. Bruce A. Bell attesting that oil and grease discharges could cause the discoloration of the water and an unpleasant odor). Under these circumstances, we conclude that Sierra Club has sufficiently alleged that the injury is caused by or fairly traceable to the defendants' actions to survive the defendants' motion to dismiss for lack of standing. *See Piney Run Pres. Ass'n v. County Comm'rs of Carroll County*, 268 F.3d 255, 263-64 (4th Cir. 2001) ("Traceability does not mean that plaintiffs must show to a scientific certainty that defendant's effluent . . . caused the precise harm suffered by the plaintiffs. Rather, a plaintiff must merely show that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged.") (internal quotation marks and citations omitted).

The defendants also argue that a favorable decision in this case will not redress the plaintiff's injuries because by the time the case is remanded for a judgment on the merits, the City will have completed a

---

[1] Notably, there appears to be some disagreement between the Circuit Courts of Appeals as to whether a plaintiff alleging a violation of the Clean Water Act has standing to sue for a defendant's monitoring and reporting violations absent standing to sue for a defendant's discharge violations. *Compare Friends of the Earth, Inc. v. Crown Central Petroleum Corp.*, 95 F.3d 358, 362 (5th Cir. 1996) ("Because FOE's members do not have standing to sue for La Gloria's discharge violations, they do not have standing to sue for the reporting violations.") *with Magnesium Elektron, Inc.*, 123 F.3d at 124 ("Because we think that it is at least possible that some plaintiff in the future might allege a specific and concrete injury arising from a defendant's failure to monitor and report its effluent discharges, we will not adopt the Fifth Circuit's bright line rule.") (footnote omitted). *See also Sierra Club v. Simkins Indus., Inc.*, 847 F.2d 1109, 1113 (4th Cir. 1988). However, given our conclusion that the Sierra Club, as the representative of its members, has standing to sue for defendants' discharge violations, we find no reason to analyze the merits of this argument.

renovation project that will eliminate the pollution discharge problems. Relatedly, the City argues that this renovation project also makes this entire controversy moot. Again, we are unpersuaded.

As the Court reiterated in *Laidlaw*, the voluntary cessation of the allegedly unlawful behavior is generally insufficient to moot a case determining the legality of that behavior. 528 U.S. at 189 (citing *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)). Indeed, "determining whether a case has been mooted by the defendant's voluntary conduct is stringent: 'A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Id.* (quoting *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968)). From the record in this case, we cannot conclude that the defendants have made this showing. Furthermore, even if the renovation project made it reasonably likely that the *discharge* violations would not recur, this hypothetical situation tells nothing about the likelihood that the defendants' violations of the *monitoring* or *reporting* requirements of the discharge permit would recur.

## B.      *Organizational Standing*

American Canoe and Sierra Club also allege that they have standing to sue on their own behalf for the defendants' monitoring and reporting violations. The district court's opinion does not directly address this argument.

Unquestionably, an association may have standing to assert an injury to itself regardless of whether its members also have standing. *Warth*, 422 U.S. at 511. As the Supreme Court has held: "There is no question that an association may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy." *Id.* In this case, American Canoe and Sierra Club have alleged that the defendants' monitoring and reporting violations affected its efforts to "research the compliance status of Kentucky dischargers . . . and to report the results of that research to [its] members; to propose legislation . . . ; and to bring litigation to prevent violation of the discharge limitations in the permit and thereby protect the waters affected by the facility's discharge." Thus, American Canoe and Sierra Club base their claim of standing purely on a theory of "informational injury." They argue that if a statute has a reporting requirement and those reports are obligated to be made public they have suffered an injury in fact for Article III purposes, if they are denied this information by the defendants' failure to report in the first instance. American Canoe and Sierra Club rely on *FEC v. Akins*, 524 U.S. 11 (1998), where the Supreme Court found a cognizable informational injury under the Federal Election Campaign Act, and *Public Citizen v. United States Department of Justice*, 491 U.S. 440 (1989), where the Court found a cognizable informational injury under the Federal Advisory Committee Act. Under the circumstances of this case, we agree that American Canoe and Sierra Club have demonstrated a comparable informational injury under the Clean Water Act.

It is black-letter law that standing requirements come in two flavors: first, as noted, the irreducible Article III minimum of an injury in fact, fairly traceable to the conduct of the defendants, and redressible by a favorable judicial decision; and second, prudential requirements–i.e., self-imposed (or, perhaps more accurately in this court, Supreme Court-imposed) limits on the federal judicial power. *See, e.g., Elk Grove Unified Sch. Dist. v. Newdow*, 124 S. Ct. 2301, 2308 (2004). The prohibition on a plaintiff seeking redress for a "generalized grievance" has often been numbered among the latter. *See id.* at 2309; *Devlin v. Scardelletti*, 536 U.S. 1, 7 (2002); *Allen v. Wright*, 468 U.S. 737, 751 (1984); *Sec'y of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 955 n.5 (1984); *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State*, 454 U.S. 464, 475 (1982); *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 120 (1979) (Rehnquist, J., dissenting); *Warth*, 422 U.S. at 499; *Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59, 80 (1978); *United States v. Richardson*, 418 U.S. 166, 196 & n.18 (1974) (Powell, J., concurring). *See also* CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & EDWARD H. COOPER, 13 FEDERAL PRACTICE & PROCEDURE § 3531, at 347 (2d ed. 1984*).* It is therefore somewhat odd that the Court in *Akins* noted first that "respondents satisf[ied] 'prudential' standing requirements" because Congress had granted

standing to all citizens who could demonstrate an Article III injury, 524 U.S. at 19-20, but then went on to discuss the "strongest argument" of the Federal Election Commission, that the lawsuit in *Akins* "involve[d] only a 'generalized grievance.'" *Id.* at 23-25. *Akins* went on to reason, however, that the "generalized" quality of the grievance at issue—that the Federal Election Commission had failed to classify a particular group as a political committee, triggering certain disclosure requirements—was irrelevant so long as the grievance was "concrete." The concreteness of the injury in *Akins*—the withholding of information relating to voting—was contrasted to the "'abstract and indefinite nature'" of "harm to the 'common concern for obedience to law.'" *Id.* at 23. Where the grievance is general because it represents only the common interest in seeing the law obeyed, Congress cannot create standing because the injury is not concrete; where some actual injury befalls every member of the community, Congress can create standing regardless of the universality of that injury. *See id.* at 20-25.

But *Akins* seems to require some additional "plus" to make an informational injury cognizable in the federal courts. *See id.* at 24-25 ("We conclude that . . . the informational injury at issue here, directly related to voting, the most basic of political rights, is sufficiently concrete and specific such that the fact that it is widely shared does not deprive Congress of constitutional power to authorize its vindication in the federal courts."). This seems to be at some odds with the Court's previous indication that "those requesting information under [the Freedom of Information Act] need [not] show more than that they sought and were denied specific agency records" to demonstrate standing, as well as its holding that an organization that wishes to force compliance with the Federal Advisory Committee Act can demonstrate a sufficient Article III injury through a federal agency's failure "to permit [plaintiffs] to scrutinize [an alleged Advisory Committee's] activities to the extent FACA allows . . . ." *Pub. Citizen*, 491 U.S. at 449. Thus, all that is necessary to demonstrate standing under the Freedom of Information Act and the Federal Advisory Committee Act is that a request for information has been rebuffed. It is difficult to see how those cases can be distinguished from *Akins* such that we should read into the *Akins* holding a firm requirement that to establish standing, a plaintiff must adequately allege more than the withholding of the required information from the citizenry.

Under these circumstances, it becomes very difficult to distinguish the present case from those cases. Although this case involves a situation in which no agency previously denied the information desired to the plaintiffs, the injury remains the same. The question of a previous agency denial may be relevant to principles of exhaustion, but as for the injury alleged, American Canoe and Sierra Club desire certain information that the defendants are allegedly under a legal obligation to provide. This is precisely the injury alleged in *Public Citizen* and in the Freedom of Information Act cases. This might be a "generalized grievance" in the sense that up to the point they request it, the plaintiffs have an interest in the information shared by every other person, but it is not an abstract grievance in the sense condemned in *Akins*: the injury alleged is not that the defendants are merely failing to obey the law, it is that they are disobeying the law in failing to provide information that the plaintiffs desire and allegedly need. This is all that plaintiffs should have to allege to demonstrate informational standing where Congress has provided a broad right of action to vindicate that informational right. *See* Cass R. Sunstein, *Informational Regulation and Informational Standing:* Akins *and Beyond*, 147 U. PA. L. REV. 613, 643 n.154 ("All that is clear is that after *Akins* a deprivation of information consists of an injury in fact if Congress has said so.").[2]

To the extent that *Akins* requires some additional "plus"—some reason that plaintiffs need the information, in addition to a Congressionally-bestowed right to sue to acquire it—that requirement is liberally construed, and we believe it is easily met in this case. Indeed, the plus found in *Akins* and that found by the majority in *Public Citizen* are each themselves extraordinarily general; it is difficult to imagine

---

[2] Congress in enacting the Clean Water Act and its citizen-suit provisions relied upon in this case "intended . . . to allow suits by all persons possessing standing under [the Supreme Court's] decision[s]." *Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 16 (1981).

what information would not make a citizen a better-informed voter, or would not affect her ability to participate in some workings of government. *See Akins*, 524 U.S. at 21; *Pub. Citizen*, 491 U.S. at 449. In this case, it is difficult to see how the organizations' interest in "proposing legislation" is less concrete and particularized than "participating in the judicial nomination process," which was the interest involved in *Public Citizen*. The interests alleged by American Canoe and Sierra Club are more like those interests alleged in *Public Citizen* and *Akins* than they are not. In determining whether an informational injury is sufficiently concrete, the universe of interests that will create a "plus" is larger than those that would support standing on their own (as evidenced by *Akins*'s reliance on voting, which is an interest shared by every citizen in America).

In sum, we hold that American Canoe and Sierra Club have sufficiently alleged an injury in fact. Although these organizations devote themselves to the protection and preservation of the environment, their claims are not based upon a purely ideological or societal interest. *Cf. Morton*, 405 U.S. at 739. Rather, their claims rest upon their organizational interests which are negatively affected by the defendants' failure to fulfill its monitoring and reporting obligations. Without this information, as noted, American Canoe's and Sierra Club's daily operations are stymied to the extent that they can no longer honor their own monitoring and reporting obligations to their members. Moreover, their ability to propose legislation and to bring litigation based upon the information collected by the defendants is clearly hampered. These activities are essential to their daily organizational activities and to fulfilling their institutional goals, and are sufficient to satisfy *Akins*. Although the defendant's failure to fulfill its monitoring and reporting violations surely injures American Canoe's and Sierra Club's societal interest in seeing that the environmental laws are faithfully executed, this does not nullify the fact that these violations also prevent these organizations from performing their daily operations. As the Supreme Court found in *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982), "[s]uch concrete an demonstrable injury to the organization's activities–with the consequent drain on the organization's resources–constitutes far more than simply a setback to the organization's abstract social interest . . . ." *See also* Sunstein, *supra*, at 654. ("[S]tanding is clearly available" where "an individual or institution is interested in obtaining information relating to enforcement of [an act of Congress], and that individual or organization has a demonstrable interest in the [subject matter and purpose of the act].").

American Canoe and Sierra Club also meet the other requirements of constitutional standing. The analysis with regard to the causation and redressability requirements for establishing the constitutional standing of Sierra Club to sue on behalf of its member applies with equal force here such that it is unnecessary to address it further.

### III.

For the foregoing reasons, we REVERSE the judgment of the district court and REMAND for further proceedings consistent with this opinion.[3]

---

[3] Given our holding, we need not address the plaintiffs' argument that the district court erred in denying its motion for reconsideration filed pursuant to Federal Rule of Civil Procedure 59(e).

---

## CONCURRING IN PART, DISSENTING IN PART

---

KENNEDY, Circuit Judge, concurring in part, and dissenting in part. I agree with the majority that the Sierra Club has representational standing because one of its members suffered an injury. However, I believe that the majority's discussion of associational standing based on informational injury impermissibly expands the Supreme Court's jurisprudence on the subject. I also believe that it raises significant public policy concerns. I therefore dissent from the portion of the majority's opinion that grants the American Canoe Association ("American Canoe") "informational standing." Additionally, because we hold that the Sierra Club has representational standing, I see no need to pass on the question of whether it has informational standing.

A.      The majority's elimination of Article III's "injury in fact" requirement.

Any type of injury, even informational injury, still must meet the Article III requirements of standing:

> Article III requires the party who invokes the court's authority to show that he has personally suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant, and that the injury fairly can be traced to the challenged action and is likely to be redressed in a favorable decision.

*Lujan v. Defenders of Wildlife, et al.*, 504 U.S. 555, 563 (1992). In particular, in informational injury cases, the D.C. Circuit has expressed skepticism that informational injury alone can meet the Article III injury in fact requirement:

> [W]e have never sustained an organization's standing in a NEPA case solely on the basis of "informational injury," that is, damage to the organizations' interest in disseminating the environmental data an impact statement could be expected to contain. We recognize the logical appeal of doing so in terms of the three constitutional standing requirements: if the *injury in fact* is the lack of information about the environmental impact of agency action, it follows that the injury is caused by the agency's failure to develop such information in an impact statement and can be redressed by ordering the agency to prepare one. Such a broad approach, however, raises "complex and difficult considerations." It would potentially eliminate any standing requirement in NEPA cases, save when an organization was foolish enough to allege that it wanted the information for reasons having nothing to do with the environment. The proposition that an organization's desire to supply environmental information to its members, and the consequent "injury" it suffers when the information is not forthcoming in an impact statement, establishes standing *without more* also encounters the obstacle of *Sierra Club v. Morton*.

*Foundation on Economic Trends, et al. v. Lyng, et al.*, 943 F.2d 79, 84-5 (D.C. Cir. 1991) (citations omitted, italics in original). The D.C. Circuit went on to deny standing to the plaintiffs in their NEPA action. In *Sierra Club v. Morton*, the Supreme Court expressed concerns about allowing informational injuries to satisfy the injury in fact requirement for standing:

> But a mere "interest in a problem," no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient by itself to render the organization "adversely affected" or "aggrieved" within the meaning of the APA. The Sierra Club is a large and long-established organization, with a historic commitment to

the cause of protecting our Nation's natural heritage from man's depredations. But if a "special interest" in this subject were enough to entitle the Sierra Club to commence this litigation, there would appear to be no objective basis upon which to disallow a suit by any other bona fide "special interest" organization, however small or short-lived. And if any group with a bona fide "special interest" could initiate such litigation, it is difficult to perceive why any individual citizen with the same bona fide special interest would not also be entitled to do so.

*Sierra Club v. Morton*, 405 U.S. 727, 739 (1972) (superseded by statute on other grounds). Both the Supreme Court in *Morton* and the D.C. Circuit in *Lyng* raise a concern that the majority never truly addresses: how can a court that grants standing to an association that premises its injury on lack of information on a problem in which it has a special interest avoid entirely eliminating Article III standing requirements for other organizations and citizens?

The majority avoids this concern by relying on two decisions from the Supreme Court: *FEC v. Akins,* 524 U.S. 11 (1998) and *Public Citizen v. U.S. Dept. of Justice*, 491 U.S. 440 (1989). To be clear, the majority's novel read of *Akins* and *Public Citizen* makes the Sixth Circuit the only Circuit in the country to read these two cases so broadly. The majority interprets these cases as creating a permissive standard that lower courts must use in deciding when citizens and organizations have the right to information. Reading *Akins* and *Public Citizen* in such a manner reads them in isolation from other important cases on the subject of standing, particularly *Lujan* and *Morton*. In so reading *Akins* and *Public Citizen* the majority goes well beyond the limited holdings the Supreme Court intended.

*Lujan* limited injury in fact by finding that Sierra Club members, although they had a special interest in the habitats of animals in other countries, did not have an injury in fact because any injury related to that special interest was too indefinite, or alternately, too remote to satisfy the injury in fact requirement of Article III. *See Lujan*, 504 U.S. at 563-68. *Akins* and *Public Citizen*, in contrast, found a specific injury based on a lack of information. However, those cases involved statutes that specifically granted individuals and groups the right to the information they sought. *See Akins*, 524 U.S. at 20-25 ("The injury of which respondents complain–their failure to obtain relevant information–is injury of a kind that FECA seeks to address."). *See also Public Citizen*, 491 U.S. at 445-46, 449-50 ("FACA was born of a desire [that]...the public remain apprised of [advisory committees] existence, activities, and cost).

In this case, although the defendant must file permit compliance information with the state and those filings are public records under the statute, the statute nowhere grants a specific right to the information. The Federal Elections Campaign Act at issue in *Akins* and the Federal Advisory Committee Act in *Public Citizen* were both specifically drafted to provide information to the public about the workings of government. The Clean Water Act, in contrast, although it requires public disclosure of the permit compliance process, focuses instead on environmental protection, not on creating broad rights to information. Thus, a significant and important difference exists between the information rights recognized in *Akins* and *Public Citizen* and the information rights developed here.

Given that *Akins* and *Public Citizen* do not control the outcome in this case, I fail to see how the majority can extricate itself from the conclusion that its holding effectively vitiates standing requirements in cases such as these. American Canoe is an organization with an interest in environmental protection. However, how does that interest differentiate it sufficiently from the interest of any other environmentally concerned citizen or organization in the country? What would stop any other national organization with a passing interest in rivers or the environment from prosecuting a claim under the majority's holding? Is not the interest that the majority seeks to uphold, when boiled down to its most basic form, simply concern for upholding the rule of law, a goal and desire that every responsible citizen and every organization shares? *Common Cause v. Federal Election Commission*, 108 F.3d 413, 418 (D.D. Cir. 1997) ("To hold that a plaintiff can establish injury in fact merely by alleging that he has been deprived of the knowledge as to

whether a violation of the law has occurred would be tantamount to recognizing a justiciable interest in the enforcement of the law."). *Lujan* and *Morton* clearly counsel against such a broad grant of standing. I cannot read *Akins* and *Public Citizen* as demanding it.

Although the majority opinion does not raise this point, because of my position, I believe that I am compelled to address the Supreme Court's holding in *Haven Realty Corp. v. Coleman*, 455 U.S. 363 (1982). In that case, the Supreme Court found that Housing Opportunities Made Equal (HOME), a public interest organization, had associational standing under the Fair Housing Act to challenge what it claimed were racially discriminatory housing practices in an area it served. The Supreme Court granted HOME standing because it felt that HOME suffered a sufficient injury in the form of a "drain on the organization's resources" because HOME "had to devote significant resources to identify and counteract defendants' racially discriminatory steering practices." *Havens Realty Corp.*, 455 U.S. at 379. The Court found that this type of injury satisfied the concerns laid out in *Morton* because it: "constitutes far more than simply a setback to the organization's abstract social interests." *Id.* Although the interests alleged in *Haven* are similar to the interests alleged by American Canoe, the key differences remain that HOME encountered significant difficulty helping individual plaintiffs counteract discrimination directed at them in a localized area. HOME also incurred additional costs as a result of these racial steering practices. In this case, although American Canoe's national goals may be impeded, they are no more impeded than any other group or individual that has a "special interest" in general environmental protection. Thus, HOME's injury is more specific, cognizable, and particular than the injury suffered by American Canoe.

B.     Injury at all?

Finally, the above objections are premised on the assumption that the permit violations constitute a "concrete and particularized" injury-in-fact to American Canoe. *Ailor v. City of Maynardville, Tenn.*, 368 F.3d 587, 596 (6th Cir. 2004). I question whether the conduct in question actually constitutes an injury to American Canoe at all. According to the majority, American Canoe claims that they will not be able to: "research the compliance status of Kentucky dischargers...and to report the results of that research to its members; to propose legislation...; and to bring litigation to prevent violation of the discharge limitations in the permit and thereby protect the waters affected by the facility's discharge." In effect, American Canoe argues, and the majority holds, that the informational injury they suffer stems from the defendants' failure to comply with its permit. However, the amended complaint identifies 405 instances in which defendants exceeded the discharge limitations of its permit, 93 monitoring violations, and only 12 reporting violations. As a result, it seems reasonably clear that American Canoe could sufficiently research defendants' compliance status to report on discharge violations to its members. Additionally, although there were 12 reporting violations, the defendants likely had more than enough information to make judgments on future legislation, and, if the organization or any of its members were directly injured by the pollution in some concrete fashion (similar to the direct injury that Sierra Club can and did claim), the organization could easily use the 405 violations to provide the basis for a lawsuit.

C.     Conclusion

Because I do not believe that the alleged injury is sufficiently particular to satisfy the injury in fact requirement absent raising the same public policy concerns raised by *Morton*, and because I question whether American Canoe suffered a concrete injury, I respectfully dissent from the portion of the majority's opinion related to informational standing.